RECEIVED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE 10/31/06

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

IN RE: BAYOU SORREL CLASS ACTION          NO: 6:04CV1101

JUDGE:HAIK

MAGISTRATE JUDGE:HILL

## REASONS FOR JUDGMENT AND ORDER

**I. INTRODUCTION**

In May of 2005 plaintiffs petitioned the Court for an award of attorneys' fees and expenses in the instant class action litigation. The Plaintiffs' Steering Committee ("PSC") filed its Fee and Cost Petition, seeking payment of fees, and reimbursement of nontaxable costs as set forth in the Special Master's Report and Recommendation. Appropriate legal notice was given. No objections to the request have been filed.

On October 19, 2006, the Report and Recommendation of the Special Master was filed with the Court and served on the parties. The parties were given ten (10) days from that date to file objections to the Report and Recommendation. To date, no objections have been filed. After an independent review of the record, the Court hereby finds the Report and Recommendation of the Special Master to be correct and, for the reasons discussed below, the Court **ORDERS** that counsel for plaintiffs be awarded thirty six percent (36%) of the common fund for attorneys' fees; seven percent (7%) of the common fund for litigation costs; and seven percent (7%) of the common fund for class action costs as follows.

1

## II. BACKGROUND

This litigation arises from the exposure to chemicals that allegedly migrated over the ground or water or air from two hazardous waste dump facilities, known as the Claw and EPAC facilities, located in Bayou Sorrel, Louisiana. The original lawsuit in this litigation was filed as a class action on May 10, 1996, encaptioned *Rineheart, et al v. Ciba-Geigy, et al*, Suit No. 47,429, Division A, 18th Judicial District Court for the Parish of Iberville, State of Louisiana, ("*Rineheart*"). The *Rineheart* case was removed by defendants to the United States District Court for the Middle District of Louisiana as *Rineheart, et al v. Ciba-Geigy, et al*, Civil Action No. 96-517(-B-M2). Additionally, three hundred named plaintiffs filed a mass joinder action entitled *Adams v. EPAC*, et al, No. 994,879, Division B in the 15th Judicial District Court for the Parish of Lafayette, State of Louisiana. That lawsuit was subsequently removed by defendants to the United States District Court for the Western District of Louisiana, Civil Action No. 99-1998 and assigned to the docket of this Court. The allegations and claims in the *Rineheart* and *Adams* actions are substantially similar and the defendants are substantially the same. Specifically, the *Rineheart* and *Adams* Complaints make broad claims spanning a period of thirty (30) years, for various elements of personal injury and property damages, based on various theories of liability related to the alleged transportation, storage and disposal of hazardous substances at three physical locations in Bayou Sorrel, Louisiana. Over the course of plaintiffs' five (5) supplemental and amending Complaints in the instant cases, more than two thousand (2,000) plaintiffs and approximately four hundred (400) defendants and their insurers were eventually named.

To organize the prosecution of this case, the Court appointed Calvin Fayard Liaison Counsel, and Jerry McKernan and J. Chandler Loupe as co-lead counsel. A Plaintiffs' Steering

Committee (PSC) was also appointed consisting of additional counsel Greg Murphy, Patrick Pendley, Wendell Gauthier (later replaced by Elizabeth Dougherty) and Hugh Sibley.

Over a period of nearly ten years these attorneys, as well as specifically dedicated members of their staff and staff contracted for the purpose of this litigation prosecuted and financed this case risking hundreds of thousands of dollars. Additionally they reviewed approximately five hundred fifty (550) banker boxes of discovery documents, each containing hundreds of thousands of pages. Approximately two hundred sixteen (216) plaintiffs were deposed and the 30(b)(6) depositions of over sixty (60) corporate defendants were also taken at various locations around the country. Additionally, plaintiffs' attorneys retained, financed and submitted to defendants the reports of the thirteen (13) experts pursuant to the requirements of this Court's Case Management Order ("CMO").

Further, plaintiffs' counsel prepared and drafted numerous pleadings, defended both dispositive and dilatory motions filed by defendants–including some involving appeals to the Fifth Circuit– and, in addition, facilitated fact discovery of the over two thousand individual claimants in this matter. The PSC was responsible for shouldering this massive amount of work, including the financing of this litigation which totals in excess of several million dollars. Against an array of defense counsel representing more than four hundred individual defendants, the PSC sustained a cohesive and effective effort in the prosecution and settlement of this action.

## III. SETTLEMENT OF THE ACTION

The work of the PSC ultimately resulted in the resolution of these cases. In the final negotiations, defendants agreed to settle all matters, provided the settlement gave them total absolution of the claims, a term which could only be accomplished through certification and

settlement of a class action. After difficult and intense negotiations between all parties, at the joint request of all parties and with the participation and assistance of the Special Master and the Court, in May 2004, a settlement agreement was reached. Consequently this Court preliminarily approved a Settlement Class.

Pursuant to the approval, notice to the putative class of the proposed settlement was issued. This adequate notice included terms and conditions of the settlements, and instructions to the putative class of their right to file a proof of claim, to object to the terms of the settlements, and, if necessary, their rights to opt out of the proposed settlement class as well as the various procedures to effect same. The notice also informed the putative class members that the Special Master submitted a Report and Recommendation setting an attorney fee reserve and various other reserves from which the class would reimburse attorneys for litigation costs, class action costs, administration costs and other expenses approved for the benefit of the class. The notice also informed the putative class members of the procedure for objecting to the Special Master's Report and provided the date time and place of the Fairness Hearing.

As stated in the Notice, the deadline for filing objections was August 3, 2004. No objections were made to the Report of the Special Master, specifically no objections were made to either Attorney Fee requests or costs as contained in the Special Master's Report and Recommendation.

Accordingly the Final Order and Judgment approving the settlement and the Report of the Special Master on Reserves is now executory, no objections and no appeals having been lodged and all appeal delays having expired. The PSC has submitted, as required by this Court, all contemporaneous time records and costs incurred to the Special Master and the Court

Appointed Disbursing Agent. A special three-member committee of the PSC was also appointed to review these submissions.

## IV. DISCUSSION

Under the "common benefit" doctrine, counsel whose efforts obtain, protect, preserve or make available a substantial benefits to a class of persons are entitled to an attorney's fee based upon the worth of the benefit to the class.[1] Generally, in Louisiana, the right of an attorney to remuneration for services is dependent upon a contract, either express or implied.[2] An exception to this rule is recognized, however, in those instances where an attorney, alone and at his own expense, has successfully maintained an action for the preservation, protection, increase, or creation of a fund in which persons other than his own clients may share or from which they may benefit.[3]

In such instances, equity requires that all who benefit must pay the costs and expenses incident thereto, including attorney's fees. The exception allowing for the award of an attorney fee even in the absence of a contract has been termed the "fund doctrine" or "common fund doctrine." Common fund cases are predominately, though not exclusively, class actions.

### Lodestar vs. Percentage of Fund

---

[1] Newberg on Class Actions, §14.01 (3rded. 1992); *Boeing Co. v. Van Gemert*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881); see also "Common Fund and Substantial Benefit"Awarding Attorneys' Fees and Managing Fee Litigation (Federal Judicial Center 1995), pp. 49-85. The history and justification for the practice of awarding fees from common funds are examined in detail in Charles Silver, *A Restitutionary Theory of Attorneys Fees in Class Actions*, 76 CORNELL LAW REVIEW 401 (1991).

[2] *Louisiana State Mineral Board v. Abadie*, 164 So.2d 159, 166 (La.App.1st Cir.1964).

[3] *Kirkpatrick v. Young*, 456 So 2d 622, 625 (La.1984); *In re Interstate Trust & Banking Company*, 235 La. at 842, 106 So.2d at 282 (on rehearing); *Abadie*, 164 So.2d at 166.

5

A "lodestar" fee award is computed by multiplying the number of hours expended by the attorneys' hourly rates.[4] The Court then, in its discretion, can adjust the lodestar depending on the respective weight of *Johnson* factors.[5] Given the issues likely to arise in computing a lodestar, courts across the country, both federal and state, are retreating from a lodestar analysis in favor of setting common benefit fees at a percentage of the benefit secured, especially in common fund cases. *See, e.g. In re Catfish Antitrust Litigation*, 939 F.Supp 493, 500 (N.D.Miss. 1996); *In re: Prudential-Bach Energy Income Partnerships Securities Litigation*, 1004 WL 150742 at *4 (E.D.La. March 7, 1994).

The Fifth Circuit seems to accept a somewhat blended approach, where the percentage fee method is used with analysis of the *Johnson* facts. *See In re Harrah's Entertainment, Inc. Sec. Litig.*, 1998 WL 832574 *4 (E.D. La., Nov. 25, 1998) (citing *In re Combustion, Inc.* 968 F. Supp. 1115, 1135 (W.D. La. June 4, 1997); *see also Strong v. BellSouth Telecomms. Inc.*, 137 F.3d 844, 849-50 (5th Cir. 1998).

When this Court considered the attorney fee issue in the *In Re Combustion Inc.* litigation, it concluded that a percentage fee award within the *Johnson* framework was appropriate. *In re Combustion, Inc.* 968 F. Supp. at 1135. Here, as in *Combustion* is the fact that over eighty (80%) percent of the individuals comprising the class executed attorney fee contracts providing

---

[4] *Heidtman v. County of El Paso*, 171 F.3d 1038, 1043 & n. 5 (quoting *Johnson v. Georgia Hwy. Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).

[5] The twelve *Johnson* factors include: (1) the time and labor required; (2) the novelty and difficulty of the question involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and, (12) award in similar cases. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d. 714, 717-719 (5th Cir.1974).

for the payment of costs expended and attorney's fees up to an amount of forty (40%) percent of the gross amount recovered.

Thus, given the propriety of utilizing the percentage fee method in common fund cases, the Court shall recognize the private attorney fee contracts limited to a fee of thirty six (36%) percent of the gross amount recovered, less an award of a percentage thereof of the fee garnered by settlement in this case to the PSC attorneys, based on analysis of the *Johnson* factors as outlined in the PSC's fee petition. *See Id.*

**The *Johnson* factors.**[6]

Based on consideration of the work and effort of the PSC undertaken on behalf of the Class, as evidenced via the record and the Fairness Hearing, the Court finds that fee awarded herein reasonable and fair in the light of the factors enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), as explained below.

**(a) The time and labor required; the novelty and difficulty of the questions involved, and the skill requisite to perform the legal services properly.**

As set forth in report of the Court-Appointed Disbursing Agent (CADA) to the Special Master, Class Counsel and their staff have accumulated in excess of 57,000 hours working on this action since its inception in 1997 through the date of the Fairness Hearing. Many of additional hours have been incurred by the PSC since that time. The PSC members have submitted costs and expense records in excess of three million dollars.

The Court finds that these records support the conclusion that the members of the PSC have devoted a large percentage of their available time to the investigation and prosecution of this case over the last eight years, in a variety of legal arenas. The Court further finds that the issues preceded by this litigation were novel and difficult. Issues such as strict or absolute

---

[6] See n. 5, *infra*, for a complete recitation of the *Johnson* factors.

liability, negligence, comparative fault, intentional fault, preemption, and punitive damages, created complex issues requiring experience and skill on the part of Class Counsel. Class Counsel engaged the assistance of numerous experts in all aspects of generic and individual causation links, as well as the development and use of technical computerization programs necessary to digest, recall and correlate the plethora of information and evidence obtained in the course of the litigation, some of which dealt with allegations over thirty years old. Accordingly, the Court finds that the novelty and difficulty of the questions involved and the requisite effort necessary by the plaintiffs' in the exercise of legal skill to achieve a favorable result in this action are self-evident and supported by the record. Additionally, having presided over these matters regularly for five years, the Court is well aware that this case involved highly complex, very intricate issues of causation based on scientific issues that crossed scientific disciplines, therein requiring an enormous amount of expert testimony, enormous judgment, enormous risk. The Court finds that the PSC has met and performed the duties and responsibilities delegated to it by the Court in a highly capable manner for the best interests of the Class.

**(b) Likelihood of preclusion of other employment.**

The Court finds that the efforts of Class Counsel in the management of this class action substantially infringed upon, if not altogether curtailed at times, the time and opportunity they would have had available to accept other employment. As the PSC is comprised of a small number of attorneys, this required all members to take on a highly visible and active role in the litigation, both in preparing for trial and in settlement proceedings. Particularly, all PSC members conduct their practices in small firms or associations which do not easily permit the shifting of needed work on other cases, with the necessary result that substantially less time has been available for them to attend to their respective routine practices.

### (c) The customary fee for similar work in the community.

As reflected in the evidentiary record submitted by the PSC in their previously submitted fee petition, as well as testimony taken at the Fairness Hearing, the customary contingency fee for representation of personal injury plaintiffs in the same area, in much less complex cases than this class action, ranges from 33 1/3% to 50% of the gross award plus costs for cases requiring the institution and prosecution of litigation.[7] Furthermore, 40% fees have been awarded in similar cases by Louisiana Federal District Courts.[8] Additionally, the attorney contracts in this litigation provide for a 40% fee in addition to the costs and more than 95% of the clients are represented by the PSC collectively or by individual members of the PSC. The Court finds that the "community" at issue is a small, isolated one previously described at length by the PSC in its petition; accordingly the Court finds that its award of 36% of the Common Fund for *all* plaintiffs' counsel to be inherently reasonable and in keeping with customary practice in the relevant local community.

### (d) The amount involved and the results obtained.

The Court finds that the $28,000,000.00 settlement negotiated by the PSC settlement in the face of great risk at all stages of the litigation (like all such similar litigation) to be an admirable, just, and outstanding result.

### (e) Time limitations imposed by the client or the circumstances.

This case has required almost continuous engagement in motion practice, hearings and conferences in the Middle District, the Fifth Circuit, and now the Western District. Indeed, the docket sheet is too massive to completely access on the Court's servers. The Court is well aware

---

[7] See, e.g., Testimony of Professor Arthur Miller during the *In re: Eunice Train Derailment* fairness hearing, page 94-95, lines 7-17.

[8] Id., page 95, lines 6-17.

that due to the nature and complexity of this case, it has often been necessary for PSC members to attend meetings or hearings or to handle emergency and urgent matters on very short notice, and the PSC often had to work through holidays to meet deadlines and present pleadings for the Court's consideration, as these matters usually required immediate attention and completion within a very short period of time. The Court finds that the PSC has handled its burden admirably, especially given the sheer numbers of clients involved.[9] Accordingly the Court finds that the effort the PSC made to bring fair and equitable closure to this litigation for the Bayou Sorrel Community has been above par given the needs and circumstances of their clients.

### (f) The nature and length of the professional relationship with the client.

Throughout the course of the Court's management of this litigation the Court has become intimately aware that the PSC has had a long relationship with the members of this Bayou Sorrel community. Particularly, several members of the PSC represented a large number of current plaintiff residents in a related litigation dating back to the early 1980s, and as a result, maintained close contacts with the small community implicated herein. The Court has seen ample evidence where counsel for the plaintiffs responded to innumerable inquires from Class members who needed explanations, assistance, and assurances. In all respects, all members of the PSC met this challenge commendably.

### (g) The experience, reputation, and ability of the attorneys.

The Court has been made aware, through its relationship with the PSC in the conduct of these proceedings, of their ability, experience and reputation as able litigation counsel. The Court finds that all plaintiffs' attorneys involved were particularly sensitive to the best interests of the Class. Accordingly, the Court will credit those affidavits detailing the respective

---

[9] The Court notes that the PSC consisted of seven members, representing approximately 2,100 clients from a mostly low to no income areas of Southern Louisiana. Defendants included approximately 400 petro-chemical and chemical corporations, many of whom were international and multinational conglomerates.

10

qualifications of all members of the PSC, including references to other class actions in which each has engaged as lead or primary counsel, which were filed into the record at the Fairness Hearing.

**(h) Whether the fee is fixed or contingent.**

The members of the PSC were appointed by the Court, although several members had undertaken the representation of individual putative Class members, including the Class Representatives, on the basis of 40% contingent fee contracts. Contingent fees, as opposed to fixed fees, are the norm in personal injury practice. Rule 23 requires that in a common fund case as this, the Court has the final assessment and approval of the reasonableness of the fee award to the Class Counsel, which the Court has set at 36% for *all* plaintiff's attorneys, 50% of which is to be distributed to the PSC for the common benefit work and 50% to the various private attorneys representing individual plaintiffs in an amount corresponding to the plaintiffs that each private attorney represents, as determined by the Special Master.

**(i) The undesirability of the case.**

The Court finds that this litigation was indeed precarious at times, with inextricably intertwined lawsuits settled in the past, prescription issues, problems of proof, problems of causation, and a host of other complex issues. Additionally, as previously noted, the PSC was a relatively small group of attorneys with limited resources pitted against hundreds of larger entities with access to enormous legal resources. Accordingly, as the case necessarily consumed a significant portion of the financial resources and careers of each member of the PSC, the risk assumed by the PSC handling the case on a contingency basis, was substantially significant given the real possibility that the suit would not be successful. Given that at all times defendants vigorously contested not only liability, but also the nature and extent of the injuries to individual Class members, the Court finds that the settlement result obtained herein to be more than

satisfactory, particularly given this case's tortured procedural and legal history, both of which contributed mightily to its almost complete undesirability.

**(j) Comparable awards in similar cases.**

As amply supported by the record and as previously noted by the Court, the Court finds that in "Louisiana ... practice [of fees awarded] has consistently been at the 40 percent level."[10] As noted earlier, two Louisiana Federal District Courts have awarded 40% in attorneys' fees.[11] A Louisiana State District Court likewise awarded 40% attorneys' fees.[12] Accordingly the Court finds that the 36% fee it has fixed for all plaintiffs' counsel to be comparable to similar cases.

## V. CONCLUSION

Documents provided by class counsel in support of the Fee and Cost Application include member attorney, staff and contract employee time, detailing various pre-settlement work and tasks performed, costs and expense detail, and supporting documentation. The Special Master, in conjunction with the Court Appointed Disbursing Agent, has performed a thorough review of these submissions and has since issued his report regarding these submissions. The Court, having observed first-hand the work of the Liaison Counsel, Lead Counsel, and various individual members of the PSC and their staff, is aware of the enormous time, energy and funds expended by the PSC on this litigation. *See, e.g., In re Combustion, Inc.* 968 F. Supp. 1115 (W.D. La. June 4, 1997).

Accordingly, the Court, based upon the above and foregoing, hereby **ORDERS** the following:

---

[10] Testimony of Professor Arthur Miller, *Eunice Train Derailment* Fairness Hearing, pg. 95, lines 2-5.

[11] *Pedeaux, et al v. Georgia Gulf Corp., et al*, Civil Action No. 01-0349 (M.D.La).

[12] *West v. G & H Seed Co.* 99-c-4984-A (27th Judicial District Court).

1. Fees for plaintiffs' counsel shall be fixed at thirty six (36%) percent of the Common Fund.

2. Fifty (50%) percent of the above fees shall be allocated to the PSC for common benefit work.

3. Fifty (50%) percent of the above fees shall be allocated to the various private attorneys representing individual plaintiffs in an amount corresponding to the plaintiffs that each private attorney represents, as determined by the Special Master and which is reflected in Exhibit A.

4. Class litigation Costs incurred by the PSC for the common benefit shall be fixed at seven (7%) percent of the common fund.

5. Class administration costs and expenses incurred by the PSC for the common benefit shall be fixed at seven (7%) percent of the common fund.

6. Subject to the reserves previously established by the Court, the Court allocates, approves, and awards attorneys' fees and costs to the individual members of the PSC for common benefit work as allowed by the Special Master, and in the amounts specified in Exhibits B1 and B2.

7. The Court Appointed Disbursing Agent ("CADA") is to notify each individual PSC member attorneys separately of their award of fees and costs and is ordered to disburse same to each PSC member upon receipt of an appropriate receipt and release of all future claims to fees and costs, with the exception of any interest they may have to those funds in the reserves previously established by separate order of this Court, and yet to be determined by this Court. CADA is further authorized to make transfers from the Distribution Cost and Tax Reserve as necessary to fund the awards specified in this

order.

8. The Court Appointed Disbursing Agent (CADA) is hereby ordered to disburse private attorney fees, to attorneys representing individual plaintiffs upon receipt of an appropriate receipt and release of all further claims to fees and costs by each attorney seeking payment.

9. All exhibits attached to the Special Master's Report and Recommendation, including calculations, shall be **SEALED** until otherwise ordered by the Court. Accordingly attorneys and parties to this Order shall keep the terms and provisions of all exhibits attached thereto and sums awarded each of them confidential and shall not disclose nor discuss said sums with any other person under penalty of sanctions to be imposed by the Court.

**THUS DONE AND SIGNED** on this, the 31st day of October, 2006.

                                                CHIEF JUDGE RICHARD T. HAIK, SR.
                                                UNITED STATES DISTRICT COURT
                                                WESTERN DISTRICT OF LOUISIANA